## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS (EASTERN DIVISION)

| | |
|---|---|
| Comcast of Georgia/Massachusetts, Inc.) and Comcast of Middletown, Inc. and Comcast of Boston, Inc. and Comcast of) California/ Massachusetts/ Michigan/Utah, Inc. and Comcast of Maine/New) Hampshire, Inc. and Comcast of) Massachusetts I, Inc. and Comcast of) Massachusetts II, Inc. and Comcast of) Massachusetts III, Inc. and Comcast of) Massachusetts/New Hampshire/Ohio, Inc.) and Comcast of New Hampshire, Inc.<br><br> ) <br><br> **Plaintiffs,** ) <br><br> **vs.** ) <br><br>Joseph Amaro, Dimas Amaro, and Joseph) Amaro and Dimas Amaro, Jointly d.b.a. CABLEJOINT and D's Electronics <br><br> **Defendants** | Case No.: 04-cv-10414-RCL <br><br><br> **MEMORANDUM IN SUPPORT OF** <br><br> **PLAINTIFF'S MOTION FOR** <br><br> **PRELIMINARY INJUNCTION AND** <br><br> **IMPOUNDMENT ORDER** |

## I. FACTS

Through various agreements with governmental entities, the Plaintiffs provide

telecommunications services, including cable television services, to subscribers in much of

Massachusetts, Connecticut and New Hampshire. In order to provide cable television services to

their subscribers, the Plaintiffs pay fees to programmers. The Plaintiffs then receive the

programming from the programmers, mostly by way of interstate radio communications. The

Plaintiffs then transmit said programming over its system. The signals the Plaintiffs transmit

over their systems are private communications not intended for public use. *See Marmelo aff.*

In order to protect their signals and maintain the value of their services, the Plaintiffs electronically encrypt and/or scramble some of their signals so that they must first be decoded by electronic decoding equipment in order to be viewed clearly on a television receiver. The Plaintiffs encrypt and/or scramble signals for premium channels, such as HBO, Showtime, and Cinemax, for which subscribers pay a separate monthly subscription fee, and pay-per-view events, such as a specific movie, concert or sporting event, for which subscribers pay a specific one time charge to view each event. The Plaintiffs' signals predominately consist of Works protected by Title 17 U.S.C. and the encryption and scrambling of the Plaintiffs' signals are technological measures that effectively control access to their signals. *See Marmelo aff.*

The Plaintiffs have provided certain of their subscribers with addressable electronic decoding equipment (hereinafter referred to as "decoders") to decode these signals. These decoders issued by the plaintiffs to their subscribers are "addressable" in that they will take instructions from the cable company. The Plaintiffs address (gives instructions) to these decoders so that a subscriber may only view that level of service that the subscriber has purchased. *See Marmelo aff.*

However, there are illegal non-addressable descrambling devices (sometimes referred to as and hereinafter referred to as "black boxes"). Black boxes are "non-addressable" in that they will not take instructions (on what to descramble and what not to descramble) from the cable company. Therefore, Black boxes are capable of defeating the Plaintiff's encoding and scrambling technology in that the black boxes will descramble all signals (including premium channels and pay-per-view events) whether the individual has paid to receive the signal or not. There is no legitimate, legal use for a black box. A black box should not be confused with a legal device known as a converter. A converter is a device that converts the signals carried in a

2

coaxial cable into signals a non-cable -ready television can utilize. Most modern televisions have this conversion capability built-in; they are "cable ready". Modern televisions do not need a converter. Most importantly, a converter does not descramble any signals. A consumer could legitimately utilize a simple converter to make an older television "cable ready" but such a converter would not descramble any scrambled signals. *See Marmelo aff.*

A black box is not a simple converter (although some models may have the ability to convert signals for older non-cable ready TVs). A black box is simply a non-addressable descrambler. It is specifically designed to ignore or refuse to accept any instructions from the cable television company as to what signals to descramble. The black box is designed to descramble all stations, all premium stations, all pay-per-view movies and all pay-per-view events, 24 hours a day, seven days a week regardless of any instructions from the cable company. There is no legitimate use for such a device. *See Marmelo aff.*

In March of 2001 the Plaintiffs and the Taunton Massachusetts Police Department began an investigation into allegations that the Defendants have been selling and/or distributing and/or manufacturing (e.g. repairing on return from purchasers) black boxes. As part of a state criminal investigation against the Defendants, the Taunton police department executed search warrants against the Defendants. Through the execution of the search warrants the Taunton Police Department obtained considerable materials including, without limitation, inventory, paper records, computer records and other items that all clearly evidenced the Defendants' black box distribution business. In addition to Defendants made admissions to police officers regarding their sales of black boxes. *See Lt. Warish aff.*

3

In late June 2001 the Taunton police department ultimately seized records that evidenced the Defendants:

1.      Were receiving considerable numbers of black boxes from out of state distributors;

2.      Were selling black boxes for profit locally;

3.      Were selling black boxes in interstate commerce through the use of a web site;

4.      Were selling the blacks boxes for commercial gain and profit;

5.      Were receiving shipments of non-working black boxes back from some of their purchasers to be "repaired". *See Lt. Warish aff.*

The Defendants responded to the police investigation by maintaining that they had a legal defense with reference to their sale of the black boxes. They claimed that all their black box sales were made with a "disclaimer" whereby the Defendants informed their purchasers that the purchaser:

1.      Must comply with all state local and federal laws regarding the ownership of cable equipment;

2.      Must be subscribing to full cable service;

3.      Will pay for all services that the purchaser receives;

4.      Will abide by all federal state and local laws concerning the reception of cable television;

5.      Will notify the cable company before using any equipment; and

6.      The Defendants then notified the Purchasers that they in no way advocated the unauthorized use or theft of cable services. *See Lt. Warish aff.*

As part of the investigation into this matter and undercover black box purchase was made from the Defendants into an employee of the Plaintiffs in Connecticut through the use of the Defendants web site. The black box in question did allow for the unauthorized interception of the Plaintiffs cable television signals in Connecticut. Also, more importantly the packaging for the black box sold into the Connecticut undercover employee of the Plaintiffs did not contain any "disclaimer" documentation whatsoever. *See Jacobs's aff.*

The Defendants were charged with criminal violations of the Massachusetts statute dealing with theft of telecommunications services, M.G.L.A. 166 § 42A, which provides:

> Whoever, with intent to defraud, obtains, or attempts to obtain, or aids or abets another in obtaining, any telecommunications services valued less than five thousand dollars by any false representation, false statement, or stratagem, by unauthorized charging to the account of another, by installing or tampering with any facilities or equipment or by any other means, shall be punished by a fine of not more than three thousand dollars or by imprisonment for not more than two and one-half years in a house of correction, or both.

> Whoever, with intent to defraud, obtains, or attempts to obtain, or aids or abets another in obtaining, any telecommunications services of a value equal to or greater than five thousand dollars by any false representation, false statement, or stratagem, by unauthorized charging to the account of another, by installing or tampering with any facilities or equipment or by any other means, shall be punished by a fine of not more than ten thousand dollars or by imprisonment for not more than ten years in a state prison, or both.

> As used in this section, the words "telecommunication service" shall include the transmission of intelligence by a community antenna television system licensed pursuant to the provisions of chapter one hundred and sixty-six A.

In February 2004 a trial was held on the Defendants state criminal charges. The Defendants' Attorneys argued that because they made their sales of black boxes with the above referenced "disclaimer" they were not liable for defrauding or assisting in defrauding the cable television company. In fact, the Defendants did not actually dispute the fact that they were

selling black boxes. Their attorney stipulated to a reading of the Police report into the record at trial. *See Lt. Warish aff.*

After the police report was read into the record the Commonwealth's prosecutor agreed to a stipulation that the sales of the black boxes were made with the above referenced "disclaimer". This stipulation was made despite the fact that a black box sold by the Defendants over their web site into Connecticut did not contain any so-called "disclaimer" documentation After reading the police report into the record and after the stipulation was made regarding the use of the "disclaimer" was entered into the record, legal arguments were made by the Commonwealth's prosecutor and by the Defense attorneys. Thereafter, without any witnesses whatsoever, the state judge acquitted the Defendants of the state criminal violations based solely upon the so-called "disclaimer" legal defense. *See Lt. Warish aff.*

As more clearly set forth in this memorandum, the Plaintiffs contend that the so-called "disclaimer" defense does not exonerate defendants from Federal civil liability (see citations in DISCUSSION section below). Accordingly, the Plaintiffs have brought:

1. This Federal Civil Action against the Defendants;

2. A motion for impoundment to protect the evidence now in possession of the police; and

3. A motion for preliminary injunction to stop the Defendants from continuing to make any sales of black boxes.

## II. DISCUSSION

### A. Liability

Based upon:

1. The voluminous evidence in the possession of the police;

2.  The Defendants' admissions;

3.  The Defendants' stipulations; and

4.   Other evidence gathered by the Plaintiffs

The Plaintiffs contend there is ample evidence for a finding of fact that the Defendants have

intentionally distributed and sold black boxes both locally and in interstate commerce for profit

knowing that said devices were to assist third parties in the unauthorized interception of the

Plaintiffs' television signals.

Such a factual situation gives rise to liability against the Defendants and in favor of the

Plaintiffs pursuant to:

a.   17 U.S.C. § 1201;

b.   47 U.S.C. § 553;

c.    M.G.L. CH. 93A, § 2 AND § 11;

d.   Common-law conversion; and

e.   Intentional Interference with Contractual Relations

**B. Liability Pursuant to the Federal Statutes and the Inapplicability of the So-called**

**"Disclaimer" Defense**

The black boxes sold and/or distributed and/or manufactured (e.g. repairing returns) by

the Defendants are primarily designed or produced for the purpose of circumventing a

technological measure, cable television encryption, that effectively controls access to works

protected under Title 17, the copyright protected works that make up most of the Plaintiffs' cable

television signals. The Defendants' actions violate 17 U.S.C. § 1201(E)(2) which provides in part:

> (2) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof, that--
>
>> (A) is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title …

The black boxes sold and/or distributed and/or manufactured (e.g. repairing returns) by the Defendants were distributed or manufactured for the unauthorized interception of cable television services.  The Defendants actions violate 47 U.S.C. § 553 (a) which provides in part:

>> … (1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.
>
>> (2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

The fact that the Defendants' claim to have used disclaimers makes it clear they knew that the black boxes *could* be used for the unauthorized interception of the Plaintiffs cable television signals. In fact, in a similar case a Federal District Court Judge found that the use of disclaimers was actually evidence that the defendants knew of the probability of the improper use of the black boxes purchased by their customers.  See. *Columbia Cable TV Co., Inc. v. McCary*, 954 F. Supp. 124 (D.S.C. 1996).

The Defendants' intent to assist others in the unauthorized interception of signals can logically and legally be inferred from the fact that they sold the black boxes and the fact that there is absolutely no legitimate use for a black box. See *General Instrument corp. v Nu-Tek Elec Mfg. Inc.* 3 F. Supp. 2d 602 (E.D. Pa. 1998), Intremedia *Partners Southeast v QB Distributors* 1998 999 F. Supp. 1274 (D. Minn.1998) and *Subscription Television of Greater Washington v. Kaufman* 606 F. Supp. 1540 (D.D.C. 1985). This reasoning was recently followed in a sister state within our First Circuit in the case. *See Cox v Violet* C.A. No. 02-338 ML (D.R.I. 2004), an unpublished decision. See copy attached as Exhibit A.

Most importantly, every Federal court that has ever considered the so-called "disclaimer" defense has uniformly rejected same as a defense to Federal Civil Liability. See:

1. *ON/TV of Chicago v. Julien*, 763 F 2d 839 (7th Cir. 1985) where the Seventh Circuit Court of Appeals said that the trier of fact could easily the disclaimer to be "transparent attempt to deny the patent illegality of the defendant's acts" id at 844;

2. *Time Warner Cable of New York v. Cable Box Wholsalers, Inc.*, 920 F. Supp.1048 (D. Ariz.1996);

3. *Intermedia Partners Southeast v. QB Distributors,* 999 F. Supp. 1274 (D. Minn. 1988);

4. *Columbia Cable TV Co., Inc. v. McCary*, 954 F. Supp.124 (D.S.C. 1996);

5. *Time Warner Cable of New York City v. Freedon Electronics* 897 F.Supp. 1454 (S.D.Fla. 1995);

6.  *Oceanic Cablevision, Inc. v. M.D. Electronics*, 771 F. Supp. 1019 (D. Neb. 1991); and

7.  *Subscription Television of Greater Washington v. Kaufman* 606 F. Supp. 1540 (D.D.C. 1985) where the court described the disclaimer as "worthless". Id at 1543

In fact, the 7th Circuit Court of Appeals even rejected the so-called "disclaimer" defense in a Federal Criminal case.  See *United States v. Gardner,* 860 F.2d 1391 (7th Cir. 1988) where the court found the disclaimer to be evidence establishing that the Defendant "was well aware that his actions were unlawful" Id at 1396.

### C. Liability Pursuant to M.G.L. CH. 93A

The Defendants' black box distribution business also gives rise to liability under M.G.L. Chapter 93A § 2. M.G.L. Chapter 93 § 2 (a) provides "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or c ommerce are hereby declared unlawful".   In the case of *Quincy Cable Systems, Inc. v. Sully's Bar, Inc*., 684 F. Supp. 1138 (Mass. 1988) this Federal District Court found that where a bar intercepted signals, without authorization, in violation of Title 47, the bar's actions also amounted to a violation of M.G.L. Chapter 93A.  Clearly one business knowingly selling devices to third parties that allow the third parties to steal from another business is an unfair and/or deceptive trade practices. Accordingly, the Defendants' actions violate M.G.L. Chapter 93 § 2 (a).

### D. Motion for an Impoundment Order

The Plaintiffs have moved for an Impoundment Order against the Defendants impounding the records, devices, inventory and all other pertinent items presently in the

possession or recently in the possession of the Taunton Massachusetts police to prevent Defendants from destroying same and from utilizing same in furtherance of their distribution scheme

17 U.S.C. § 1203 (b) (2) provides that this court may order the impounding, on such terms as it deems reasonable, of any device or product that the court has reasonable cause to believe was involved in a violation of 17 U.S.C. § 1201.

In addition an impoundment order can also be authorized pursuant to the title 47 § 553 as an element of the statutorily authorized injunction. Orders (even ex parte orders) for the seizure and impoundment of black boxes and business records from the sale of black boxes are routinely granted by other federal courts. *See e.g., Century v. Carrillo Diaz*, 43 F.Supp. at 171 (ex parte seizure ordered); *Freedom Electronics*, 897 F.Supp. at 1458 (ex parte seizure ordered); *U.S. Cable T.V.*, 920 F.Supp. 321, 324-325 (E.D.N.Y. 1996) (court orders two ex parte seizures in two states within two months); TWC *Systems Corp. v. Muneyyirci*, 90 Civ. 2997 (E.D.N.Y. Oct. 4,1990) (Dearie, J.) discussed in *Muneyyirci,* 876 F.Supp. 415, 417 (E.D.N.Y. 1994).


In this action, there does not appear to be any real dispute as the operative facts. Instead, the Defendants have totally relied upon the so-called "disclaimer" defense that will not protect them from Federal Civil liability. Accordingly, the Plaintiffs have set forth a clear case of liability against the Defendants for violation of 17 U.S.C. § 1201(E)(2). 17 U.S.C. § 1203 (b) (2) gives this court the remedial power to impound the items involved in the violation. The items involved with the Defendants violations of 17 U.S.C. § 1201(E)(2) are precisely the items held by the Taunton Massachusetts police department. Therefore, this court should impound all of the evidence seized and presently in the possession of the Taunton Massachusetts police department

to protect the evidence and to make sure that the black boxes are not further distributed by the Defendants.

## E. Motion for a Preliminary Injunction

The Plaintiffs have moved for an preliminary injunction against the Defendants to prevent the Defendants from continuing to manufacture, sell or distribute products and services that are primarily designed or marketed for use in circumventing the measures employed by the Plaintiffs to prevent unlawful access to the Plaintiffs' cable television programming or are intended to be of assistance in the unauthorized interception of the Plaintiffs' cable television signals.

The court is authorized to order a preliminary injunction pursuant to:

1. 17 U.S.C. § 1203 (b)(1) provides that this court can order a temporary injunction on such terms, as it deems reasonable to prevent or restrain violations of § 1201;

2. 47 U.S.C. § 553(c) (2) (A) provides that this court can order a temporary injunction on such terms as it deems reasonable to restrain violations of § 553 (a) (1).

3. M.G.L. Ch. 93A § 11 and that statute provides for equitable relief, including an injunction as the court deems to be necessary and proper;

4. Fed.R.Civ.P. 64

The plaintiffs submit that they can establish liability at least as to the claims of statutory violations pursuant to the Title 47, Title 17 and M.G.L. Ch. 93A. This is because the Defendants have not really put up any factual defense to these claims. Instead, the Defendants have essentially admitted the pertinent facts but they have relied upon a defense, the so-called "disclaimer" defense, which has no applicability for Civil Liability.

In light of the fact that these statutes contain express authority for issuance of statutory injunctions to Plaintiffs need not prove irreparable harm for the injunction to issue. Numerous courts have held that when express authority for issuance of "statutory" injunctions is provided by legislative enactment such as the Communications Act, an injunction, including an impoundment order, may issue without resort to the traditional "equitable" prerequisites of such relief *MediaOne of Delaware, Inc. v. E & A Beepers*, 43 F.Supp.2d 1348,1353 (S.D.Fla. 1998); *Century ML-Cable v. Carrillo Diaz*, 43 F.Supp.2d 166, 171 (D.P.R. 1998) ("*Carrillo I*"); *QB Distributors*, 999 F.Supp. at 1283; *Freedom Electronics*, 897 F.Supp. at 1460; *General Instrument Corp. v. Nu-Tek Electronics & Manufacturing, Inc.*, 3 F. Supp 2d 602, 607 (E.D.Pa.1998), aff'd 197 F.3d 83 (3d Cir.1999). As the court in *Securities Industry Assn. v. Board of Governors of Federal Reserve System*, 628 F.Supp. 1438 (D.D.C. 1986), noted:

> [I]n a number of cases, courts have found it unnecessary to inquire into the traditional requirements for injunctive relief when statutory violations are involved. *See United States v. City of San Francisco*, 310 U.S. 16, 31, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940) (equitable doctrines do not deprive courts of power to enforce declared congressional policy) ... *Community Nutrition Institute v. Butz*, 420 F.Supp. 751, 754 (D.D.C. 1976) (where federal statute violated, court need not inquire into traditional requirements for equitable relief) .... A review of the various cases makes clear that, where federal statutes are violated, the guiding principle for determining the propriety of equitable relief is whether an injunction is necessary to effectuate the congressional purpose behind the statute.

*Id.* at 1443; *Federal Trade Commission v. Rhodes Pharmacal Co.,* 191 F.2d 744 (7th Cir. 1951) ("...where an injunction is authorized by statute, it is enough if the statutory conditions are

satisfied"); *Duke v. Uniroyal, Inc.,* 777 F.Supp. 428, 432-3 (E.D.N.C. 1991) (court found that it could issue an injunction without evaluating traditional factors).

In the alternative the Plaintiffs submit that they are entitled to a preliminary injunction pursuant to Fed.R.Civ.P. 64 when the traditional factors are considered:

**1.      Likelihood of Plaintiff's Success on The Merits.**  Clearly have already shown a likely success on the merits of their case.  Once the "disclaimer" defense is ruled out as a matter of law there seems to be little, if any factual dispute in this action.  The Defendant's are selling black boxes in violation of the Federal statutes references above and in violation of state statutory and common law.

**2.      Plaintiff's Irreparable Harm Absent Injunctive Relief**

The nature and degree of irreparable harm caused to cable operators by black box operations is well established.  In *Storer Communication, Inc. v. Mogel*, 625 F.Supp. 1194 (S.D.Fla. 1985) the court cited *Home Box Office, Inc. v. Pay TV of Greater New York*, 467 F.Supp. 525, 529 (E.D.N.Y. 1979) for the proposition that when a clear violation of a Plaintiff's statutory rights has been shown, the necessity of showing irreparable harm is virtually eliminated, 625 F. Supp. at 1202, and that distributors of cable television services had suffered irreparable harm from the sale of black boxes. *See also E & A Beepers*, 43 F.Supp. 2d at 1354. The *Storer Communications* Court held: "Defendant's conduct causes irreparable harm because Plaintiff's ability to retain existing subscribers, to enlist new subscribers, to acquire suitable programming and to remain in the cable business depends on their reputation as the sole source of the cable programming that Plaintiff provides." *Id.* at 1202.

Moreover, the Plaintiffs, in most cases have no practical method of discovering unauthorized reception of its programming services by use of black boxes.  Indeed, "[O]nce an individual buys a decoder, he is lost ... forever as a potential subscriber." *Chartwell*

*Communications Group v. Westbrook*, 637 F.2d 459, 467 (6th Cir. 1980). *See also ON/TV of Chicago v. Julien,* 763 F.2d 839, 844 (7th Cir. 1985); *QB Distributors,* 999 F.Supp. at 1284 ("Given that the market for and utilization for these devices is hidden, if Defendants are allowed to continue manufacturing and selling these products, there is no way Intermedia, can protect itself from subscribers using these products to pirate its services"); Century *v. Carrillo,* 43 F.Supp.2d at 172 (noting that numerous reported decisions hold ongoing loss of revenue and subscribers due to non-detectable devices constitutes irreparable harm); *Cox Cable Cleveland Area*, 582 F.Supp. at 381.

In addition to Plaintiffs' unknown lost revenues and business opportunities, Defendants' illegal sales of decoding equipment result in a loss of franchise fees to various governmental entities in which Plaintiffs and other cable service providers operate. *American Television and Communications Corp. v. Floken, Ltd.,* 629 F.Supp. 1462, 1466 (M.D. Fla. 1986); *Cox Cable Cleveland Area*, 582 F.Supp. at 381.

**3.     Balancing of Hardships**

The Plaintiffs seek a preliminary injunction enjoining Defendants from sales of black boxes. The Plaintiffs rent (at a nominal FCC-regulated cost) such equipment to its subscribers and therefore no legitimate retail market for such decoders exists, consequently, they have no purpose other than to enable purchasers to steal cable television programming services. Accordingly, the only business that Defendants would be enjoined from pursuing is already proscribed by federal civil and criminal statute. See, 47 U.S.C. Sections 605 and 553; *E & A Beepers*, 43 F.Supp.2d at 1355.

Amending the Communications Act of 1934 (which statutorily provided aggrieved cable operators with injunctive relief and statutory damages for violations of the section) in 1984, the House Committee on Energy and Commerce noted:

> Theft of service is depriving the cable industry of millions of dollars of revenues each year that it otherwise would be receiving. The committee believes that theft of cable services poses a major threat to the economic viability of cable operators and cable programmers and creates unfair burdens on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable services without paying for it.

H.R. Rep. No. 98-934, 98th Cong., 2d Sess. 83, *reprinted in* 1984 U.S. Code Cong. & Admin. News 4655, 4720.

Imposing the proposed injunctive relief would not foreclose Defendants from engaging in legitimate conduct, but would only preclude them from committing further violations of state and federal criminal statutes. *See e.g. Storer Communications*, 625 F.Supp. at 1203 ("The alleged illegal activities of the Defendant are not worthy of any protection .... Defendant has no vested right to earn money by violating the law. Defendant will suffer no harm if an injunction is issued which simply requires them to obey the law."). *See also ON/TV of Chicago*, 763 F.2d at 844; *Freedom Electronics*, 897 F.Supp. at 1460; *QB Distributors*, 999 F.Supp. at 1284; *Cox Cable Cleveland Area*, 582 F.Supp. at 381. On the other hand, the continued sale of these devices by Defendants levels irreparable harm upon Plaintiff's business integrity and revenues.

Defendants' only possible harm is the loss of a lucrative illegal enterprise. Given Defendants' propensity to engage in criminal conduct, a preliminary injunction is necessary to protect Plaintiffs during the pendency of this action. A balancing of the hardships shows that

Plaintiffs need and are entitled to the relief it seeks. Accordingly, this Court should enjoin Defendants' manufacture, sale, modification and distribution of "pirate" cable television descrambling devices.


4. **The Injunction Will Not Disserve the Public Interest**

Plaintiffs' relief, if granted, will not disserve the public interest and, in fact, will further the public interest in several ways, apart from its benefits to Plaintiffs. First, Defendants' violations of federal and state statutes which specifically provide for injunctive relief (which statutes embody legislative determinations regarding public policy), standing alone, are sufficient to demonstrate the relief sought by Plaintiffs will further the public interest. *See Carillo*, 43 F.Supp. at 174 ('The Court finds that the illegal modification and/or distribution of cable television decoding devices with the intent that they be used for the unauthorized interception of services without payment of subscription fees constitutes conduct which is criminal in nature, and the public's interest in preventing such conduct is evident"); *E & A Beepers*, 43 F.Supp.2d at 1355 ("halting Defendants' manufacture and sale of decoding devices promotes the public interest by preventing further conduct Congress declared to be illegal in § 553"); *QB Distributors*, 999 F.Supp. at 1284 (same); *Securities Industry Assn.*, 628 F.Supp. at 1443 (when injunctive relief is sought to prevent continuing violations of federal statutes, "...the equities to be balanced are not simply those of F. Supp at 1284 the private litigants, but also the interests of the public as defined by Congress"). *See also Cox Cable Cleveland Area*, 582 F. Supp. at 381.

Second, the Defendants' illegal sale of black boxes, and the consequential theft of encoded cable programming services, results in a loss of franchise fees to franchiser-

municipalities that receive a percentage of the franchisee's revenues. *See e.g., Floken,* 629 F.Supp. at 1466; *Storer Communications,* 625 F.2d at 1203; *Cox Cable Cleveland Area,* 582 F.Supp. at 381.

### F. Conclusion

In light of all of the above the Plaintiffs submit that there is ample, undisputed evidence that the Defendants were engaged in the intentional, knowing sale and/or distribution of black boxes for profit. These actions violate various statutes and the Defendants' so-called "disclaimer" defense is no defense to Federal civil liability. Accordingly, the Plaintiffs are entitled to a preliminary injunction ordering the Defendants to cease and desist from the sale and/or distribution of black boxes and an order impounding the evidence seized by the Taunton Massachusetts Police Department

Respectfully Submitted for the Plaintiffs,
By Their Attorney,

John M. McLaughlin
**MCLAUGHLIN SACKS**
31 Trumbull Road
Northampton, MA 01060
Telephone: (413) 586-0865
BBO No. 556328

Date