# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS (EASTERN DIVISION)

| | |
|---|---|
| Comcast of Georgia/Massachusetts, Inc. and Comcast of Middletown, Inc. and Comcast of Boston, Inc. and Comcast of California/ Massachusetts/ Michigan/Utah, Inc. and Comcast of Maine/New Hampshire, Inc. and Comcast of Massachusetts I, Inc. and Comcast of Massachusetts II, Inc. and Comcast of Massachusetts III, Inc. and Comcast of Massachusetts/New Hampshire/Ohio, Inc. and Comcast of New Hampshire, Inc. | Case No.: **04-cv-10414-RCL** <br><br> **PLAINTIIFFS' LOCAL RULE 56(a)1 STATEMENT** |
| **Plaintiffs,** | |
| vs. | |
| **Joseph Amaro, Dimas Amaro, and Joseph Amaro and Dimas Amaro, Jointly d.b.a. CABLEJOINT and D's Electronics** | |
| **Defendants** | |

Pursuant to Local Rule 56(a) 1, the Plaintiffs, the Comcast entities listed above, state that there is no genuine issue to be tried with respect of the following material facts of record:

### The Plaintiffs' Business and Analog Pirate/descrambling Technology

1.    Through various agreements with governmental entities, the Plaintiffs provide telecommunications services, including cable television services, to subscribers in much of Massachusetts, Connecticut, New Hampshire, and Maine.

2.    The Plaintiffs in this action are some of the Comcast entities providing signals in New England.  The Plaintiffs are:

a.   Comcast of Georgia/Massachusetts, Inc. is a Rhode Island corporation, authorized to do business in the Commonwealth of Massachusetts including the town of Taunton.

b.   Comcast of Boston, Inc. is a New York corporation, authorized to do business in the Commonwealth of Massachusetts in the city of Boston.

c.   Comcast of California/ Massachusetts/ Michigan/Utah, Inc. is a Delaware corporation, authorized to do business in the Commonwealth of Massachusetts including the town of Brookline.

d.   Comcast of Massachusetts I, Inc. is a Massachusetts corporation authorized to do business in the Commonwealth of Massachusetts including the towns/cities of Cambridge, Dighton, Lawrence, Marlborough, Mattapoisett, Methuen, Natick, Norwell, Quincy, Woburn, and Yarmouth.

e.   Comcast of Massachusetts II, Inc. is a Delaware corporation, authorized to do business in the Commonwealth of Massachusetts including the town of Somerset and city of Springfield.

f.   Comcast of Massachusetts III, Inc. is a Delaware corporation, authorized to do business in the Commonwealth of Massachusetts including the towns of Belmont and Braintree and the city of Haverhill.

g.   Comcast of Massachusetts/New Hampshire/Ohio, Inc. is an Ohio corporation, authorized to do business in the Commonwealth of Massachusetts including the towns of Fairhaven and Holliston and the cities of Chelsea and Nashua.

h.    Comcast of Middletown, Inc. is a Delaware corporation authorized to do business in the state of Connecticut including the town of Cromwell.

i.    Comcast of New Hampshire, Inc. is a Maryland corporation authorized to do business in the state of New Hampshire including the city of Manchester and the town of Bedford.

j.    Comcast of Maine/New Hampshire, Inc. is a New Hampshire corporation authorized to do business in the states of New Hampshire and Maine including the cities/towns of Concord, Derry, Epping, and New Boston, New Hampshire.

3.    There are other Comcast entities in New England, and outside of New England the Plaintiffs have other "sister" corporate affiliates that provide telecommunications services, including cable television services, to subscribers. All in all, the Plaintiffs and their corporate affiliates provide cable television services to subscribers in much of the United States of America. When reference is made to the Plaintiffs and all of their affiliates in this statement they will hereinafter collectively be referred to as "Comcast". (Affidavit, Marmelo Paragraph 22)

4.    The devices which are the subject of this civil action are non-addressable coaxial cable analog descramblers. These devices are often called and will hereinafter be referred to as "black boxes".  Black boxes were capable of defeating Comcast's analog encoding and scrambling technology in that black boxes would descramble all analog signals (including premium channels and pay-per-view channels)

whether the individual using the black box has paid to receive the signals or not. Black boxes will not take instructions from the cable television company regarding what the user is authorized to receive; they cannot be "addressed". (Affidavit, Marmelo Paragraphs 26, 34)

5.      Black boxes were utilized by dishonest individuals when Comcast encrypted their signals and sent their signals in an analog fashion. While there may still be a few Comcast systems utilizing such technology, most Comcast systems and all of the Plaintiffs' New England systems stopped utilizing analog descrambling technology by the middle of 2005. This process of switching from analog to digital was done incrementally starting in approximately mid 2002. Black boxes do not appear to work to decrypt signals that are now encrypted digitally. Accordingly, these statements of fact pertain to the Comcast systems while they were still operating under analog encryption, generally to the timeframe from 2000 through the end of 2004. (Affidavit, Marmelo Paragraph 34)

6.      In order to provide cable television services to its subscribers, Comcast pays fees to programmers. Comcast then receives the programming from the programmers, mostly by way of interstate radio communications. Comcast then transmits said programming over their systems. The signals Comcast transmits over its systems are private communications not intended for public use. (Affidavit, Marmelo Paragraphs 18, 19)

7.    In order to protect their signals and maintain the value of their services Comcast encrypted and/or scrambled, in an analog fashion, some of their signals so that they must first have been decoded by electronic decoding equipment in order to be viewed clearly on a television receiver.  (Affidavit, Marmelo Paragraph 24)

8.    Comcast utilized analog encryption to encrypt and/or scramble signals for premium channels, such as HBO, Showtime, and Cinemax, for which subscribers would have paid a separate monthly subscription fee, and pay-per-view events, such as a specific movie, concert or sporting event, for which subscribers would have paid a specific one time charge to view each event. (Affidavit, Marmelo Paragraph 25)

9.    Comcast's signals predominately consisted of Works protected by Copyright. That is, most of the signals sent over the Plaintiffs' system are proprietary signals owned by various entities and protected by copyright law. (Affidavit, Marmelo Paragraph 30b)

10.    Comcast provided subscribers with addressable electronic decoding equipment (hereinafter referred to as "decoders") to decode these signals.  Comcast addressed (programmed or gave instructions to) these decoders so that a subscriber would only view the level of service that the subscriber had purchased. (Affidavit, Marmelo Paragraphs 24-26)

11.     The encryption and scrambling of Comcast's signals were technological measures that effectively controlled access to their signals. (Affidavit, Marmelo Paragraph 23)

12.     Individuals utilizing black boxes would still purchase some signals from Comcast. A subscriber must normally purchase some non-premium cable television stations (e.g. MTV, The History Channel, etc.) just to get signals into the home such that the scrambled television stations, the premium channels and the pay-per-view channels could then be covertly descrambled.  Also, the non-premium cable television stations were offered to subscribers in groupings of channels ("tiers"). These channels were either delivered in groups to the subscriber in a *non-scrambled fashion* or they were simply not delivered into the home at all. A descrambling device would have been of no assistance in overtly obtaining the non-premium cable television stations.  This explains why an individual with a descrambling device might still be paying the cable television company for non premium cable television stations while utilizing a descrambler to descramble the premium channels and pay-per-view offerings.  (Affidavit, Marmelo Paragraph 32)

13.     During the pertinent time, Comcast's television charges and offerings varied significantly, but taking into account the length of time, the variations in price and variations in offerings, it is reasonable to state that an individual,  through the use of the device,  would have had access to all of the:

a.    Premium channels with an *approximate on average* price of $65.00 per month.  This $65.00 figure represents the value of the premium channels an individual would have had access to over and above the non premium stations he was actually paying for. (Affidavit, Marmelo Paragraph 67)

b.    Pay per view movie offerings with an *approximate on average* price of $3.95 per movie. There were numerous movies offered per month. (Affidavit, Marmelo Paragraph 68a)

c.    Adult pay per view movie offerings with an *approximate on average* price of $8.00 per movie. There were numerous Adult movies offered per month (Affidavit, Marmelo Paragraph 68b)

d.     Special event pay per view offerings (e.g.; boxing or wrestling match) with an *approximate on average* price of $30.00 per special event.  On average there was at least one special event per month. (Affidavit, Marmelo Paragraph 68c)

14.    Comcast did a detailed analysis of its legitimate, paying subscribers in a New England franchise as to their pay-per-view purchasing in the month of February, 2003.  This analysis showed that a statistically significant number (.17%) of its legitimate, paying, high-end purchasers purchased fourteen (14) or more pay-per-view movies during that particular month, an average cost of $55.30 per month. (Affidavit, Marmelo Paragraph 69)

15.    There is no legitimate use for a black box. There are, however, other legitimate devices related to cable signals:

a.    A converter is a device that converts the signals carried in a coaxial cable into signals a television can utilize. Most modern televisions have this conversion capability built-in; they are "cable ready". Modern televisions do not need a converter. Most importantly, a converter does not descramble any signals. A consumer could legitimately utilize a simple converter to make an older television "cable ready", but such a converter would not descramble any scrambled signals; and (Affidavit, Marmelo Paragraph 33)

b.    Cable companies issued/leased to most of their subscribers a device called an analog "addressable converter/descrambler". These devices converted signals for older televisions that are not "cable ready" and they descrambled analog signals based upon the instructions that the cable company sends to the addressable converter/descrambler. The crucial element of the addressable converter/descrambler was that it was "addressable". That meant the cable company could "address" the descrambler. "Addressability" refers to the descrambler's ability to descramble signals based *only* upon the instructions that it receives from the cable company. (Affidavit, Marmelo Paragraph 26)

16.    A black box is not a simple converter (although some models may have the ability to convert signals for older non-cable ready TVs). A black box is a descrambler.  However, it is not an *addressable* converter/descrambler. Rather, it is a *non-addressable* descrambler that is specifically designed to ignore or refuse

to accept any instructions from the cable television company as to what signals to descramble. The black box was designed to descramble all stations, all premium stations, all pay-per-view movies and all pay-per-view events 24 hours a day, seven days a week regardless of any instructions from the cable company. There is no legitimate use for such a device. (Affidavit, Marmelo Paragraphs 27, 28)

17.    While most black boxes are distributed already manufactured as non-addressable coaxial cable analog descramblers, it is also possible, at a local level, to modify existing equipment to create a non-addressable coaxial cable analog descrambler. Such a modification is often called "chipping" a box. Chipping a box is where an individual obtains an addressable descrambling device, usually an addressable converter/descrambler and where that individual then places certain electronic equipment known as "chips" inside the electronic circuitry of the converter/descrambler to modify the device in such a way that it then becomes a non-addressable descrambling device, in essence a homemade *black box.* (Affidavit, Marmelo Paragraph 29)

18.    Non-addressable coaxial cable analog descramblers, *black boxes* and *homemade black boxes* were capable of defeating the Plaintiffs' analog encoding and scrambling technology. (Affidavit, Marmelo Paragraph 30)

19.     Non-addressable coaxial cable analog descramblers, *black boxes* and, *homemade black boxes* were primarily designed to circumvent the technological measures the Plaintiffs used to protect access to its signals and the works protected by copyright carried on its signals. (Affidavit, Marmelo Paragraph 30)

**The Defendants' Illegal Business**

20.     From at least July 1, 2000 until June, 2001 the Defendants, Dimas Amaro and Joseph Amaro, were in the business of selling black boxes.  (Affidavit Mooney, Exhibits A and B, and Pay Pal records - CD, Transcript of criminal trial Page 7 line 4)

21.     The essential purpose of a black boxes is that it can see receive *every* channel from a cable company.  If a user were to hook up a black box, they could receive every channel from the cable company. (Transcript of criminal trial Page 7 lines 4 – 8)

22.     The Defendants received large shipments of black boxes from several companies. (Transcript of criminal trial page 7 lines 17 - 19, Affidavit Enos Paragraphs 5, 8)

23.     The Defendants then would sell the black boxes out to other individuals. (Transcript of criminal trial page 7 line 20, Affidavit Jacobs Paragraphs 7, 13, Pay Pal records – CD, Exhibit A to Mooney Affidavit)

24.    The Defendant, Dimas Amaro, would usually sell black boxes online including

sales through E-bay. (Affidavit Jacobs Paragraph 4, Pay Pal records - CD)

25.    The defendant, Joe Amaro, would usually sell black boxes locally.  (Transcript of

criminal trial Page 7 line 23)

26.    During the course of the state criminal investigation the Defendants, in March of

2001 four shipments/packages were sized from UPS;

a.    The first package seized was addressed to the Defendant, Dimas Amaro, at

his residence of 333 Cohannet Street, Taunton, Massachusetts.  It

contained three cable boxes along with a note from a certain Cheryl

Brown complaining that two of the boxes were new but they would not

descramble and that the third box, which had been working properly, had

suddenly stopped.  This package had a return address for Ms Brown in

Texas.  She appeared to be looking either for a replacement or a refund

because the boxes were not descrambling.  After an examination of the 3

boxes in question, it was determined that that 2 of the 3 boxes were

actually functioning/working black boxes and that the third box would not

descramble. (Transcript of criminal trial Page 8 lines 5 - 13, Affidavit,

Marmelo Paragraph 45)

b.    The second package seized was addressed to Joe Amaro and was a

company in Las Vegas, Nevada, Wholesale Electronics which shipped out

the boxes. The package contained an invoice from Wholesale Electronics

for 7 devices each described as a "VM4000 UNIVERSAL" and 1 device described as a "COOL BOX" along with remote controls. There was no charge for the subject devices. This invoice was in conjunction with some type of warranty. Illegal sellers of black boxes actually do honor warranties. The package also contained numerous sticker notes which had been attached to various boxes. The notes made various complaints about the boxes. This shipment was a shipment of boxes that were repaired by Wholesale pursuant to warranty complaints made by the Defendant, Joe Amaro. The boxes were then seized from UPS as they were being shipped back to the Defendant. After examining the 8 boxes in question, it was determined that all 8 boxes were working/functioning black boxes. (Transcript of criminal trial Page 8 lines 14 - 22, Affidavit, Marmelo Paragraph 46)

c.   The third package seized was addressed to the Defendant, Joseph Amaro. It contained 12 boxes, with instructions how to use the boxes to decode signals. The package contained an invoice from Wholesale Electronics for 11 devices each described as a "VM4000 UNIVERSAL" and 1 device described as a "VM+PLATINUM UNIVERSAL". The price for each device was $70.00. This price is consistent with the purchase of black boxes in such a large number. After examining the 12 boxes in question, it was determined that all 12 boxes were Black Boxes. This was a shipment of twelve black boxes purchased by the Defendant, Joseph Amaro from wholesale electronics which was seized at UPS in transit to

the Defendant.  (Transcript of criminal trial Pages 8 - 9, Affidavit, Marmelo Paragraph 47)

    d.    The fourth package was addressed to Dimas Amaro and it had a shipping label on it from "Custom Products Corporation" in Ohio.  After examining the box in question, it was determined that it was a black box. (Transcript of criminal trial Page 9 lines 5 - 7, Affidavit, Marmelo Paragraph 48)

27.    In addition a seizure from UPS was made in April of 2001 of a package addressed to the Defendant, Dimas Amaro. The package contained written statement from an individual in Pennsylvania asking for refund and complaining that this device would not work in his system.   After examining the box in question it was determined that it was a functioning/working black box. (Transcript of criminal trial Page 9 lines 10 - 12, Affidavit, Marmelo Paragraph 49)

28.    The criminal investigation into the Defendants revealed that UPS shipped over 100 parcels to the Defendants' address at 333 Cohannet Street, Taunton Massachusetts during the pertinent time frame and that many of the parcels came from Distributors of black boxes. (Transcript of criminal trial Page 9 lines 13 - 20, Affidavit Enos Paragraph 10)

    a.    10 packages from a company called Clearview Cable, a company known to have dealt in black boxes; (Transcript of criminal trial Page 9 lines 15, 16, Affidavit Enos Paragraph 13)

    b.    16 packages from INB Group electronics, a company whose invoices reference black boxes by their trade name; and (Transcript of criminal trial Page 9 line 17, Affidavit, Marmelo Paragraph 57b)

    c.    69 Packages from Wholesale Electronics; the company whose shipment of black boxes to the Defendants had been seized and examined. (see paragraph 26c above, Transcript of criminal trial Page 9 lines 13 - 15, Affidavit Enos Paragraph 11)

29.    In early June 2001, after receiving information from Comcast employees in Massachusetts, Mr. William Scott Jacobs,  a Connecticut employee of Comcast (hereinafter "the Connecticut employee")  took actions to initiate an interstate, Internet black box purchase from the web site that was being operated by the Defendant, Dimas Amaro; (Affidavit Jacobs Paragraph 4)

30.    The Connecticut employee first created a Hotmail account, BJACOBS123@HOTMAIL.COM: (Affidavit Jacobs Paragraph 5)

31.    The Connecticut employee also created a PAYPAL account utilizing a Hotmail address; (Affidavit Jacobs Paragraph 6)

32.    On June 4, 2001, the Connecticut employee placed an Internet order for a black box from the web site www.cablejoint.net; (Affidavit Jacobs Paragraph  7)

33.    The Connecticut employee utilized a MasterCard credit card with this PAYPAL

account paying $140.00 for the black box; (Affidavit Jacobs Paragraph 8)

34.    Payment was made to CABLEJOINT@YAHOO.COM; (Affidavit Jacobs

     Paragraph 9)

35.    The transaction details from the PAYPAL account evidenced a payment of

     $140.00 to Dimas Amaro with an ID # of 0N952025B84648630; (Affidavit

     Jacobs Paragraph 10)

36.    The Connecticut employee utilized the address of 34 Shunpike Road, Suit 3,

     Cromwell, CT 06416-2453, a "Mail Boxes Etc" facility for the requested delivery

     of the black box; (Affidavit Jacobs Paragraph 11)

37.    On June 20, 2001, a black box arrived at the Cromwell facility and The

     Connecticut employee picked up the package; (Affidavit Jacobs Paragraph 12)

38.    The package contained a black box and certain peripheral items such as a remote-

     control but the package did not contain any so-called "disclaimer" documents;

     (Affidavit Jacobs Paragraph 13)

39.    The device the Connecticut employee received was tested and it was determined

     that the box in question was a black box.  (Affidavit Jacobs Paragraph 14)

40.   In June of 2001, the Taunton Police Department executed a search warrant on the

Defendants home at 333 Cohannet Street, Taunton Massachusetts. (Transcript of

criminal trial Page 10).

41.   When the Taunton Police Department executed a search warrant on the

Defendants home at 333 Cohannet Street, Taunton Massachusetts, they seized

certain computers. (Transcript of criminal trial Page 10 lines 11 - 12, Affidavit

Mooney Paragraph 4)

42.   Mr. James Mooney, then an agent of the United States Secret Service, assisted the

Taunton Police Department determined that one of the computers contained the

list of the sales of the subject boxes made by the Defendants the listings included:

(Transcript of criminal trial Page 10 lines 13 - 15, Affidavit Mooney Paragraph 8)

   a.   A list entitled "sent-paid" contained over approximately 321 entries.

       Almost all of these entries contained a price, a model designation, the

       number of models, a name, an address and a date. (Affidavit Mooney

       Paragraph 8a)

   b.   A list entitled "money orders" contained over approximately 48 entries.

       Almost all of these entries contained a price, a model designation, the

       number of models, a name, an address and a date. (Affidavit Mooney

       Paragraph 8a)

   c.    A list entitled "Returns" contained over approximately 102 entries.

       Almost all of these entries contained a price, a name, an address and

information and a reference to either a refund or replacement. (Affidavit

Mooney Paragraph 8b)

43.    Significantly, one of the individuals listed on the "sent-paid" list that was listed as

having purchased, paid for, and received a box was the Connecticut employee

who indeed purchased and received a black box from the Defendants. (Transcript

of criminal trial Pages 9 - 10, Affidavit Jacobs Paragraphs 7, 12)

44.    Also of significance was an entry on the "sent-resent" list which stated "Rich

Malcolm, 121 Pine Crest Rd. Holliston MA, 01746—(WANTS TO EXCHANGE

FOR REBELION) (WORKING OK)" from which  it appeared that this individual

had purchased some type of box but wanted to exchange the original device for a

REBELION black box, and the REBELION was ultimately working OK.

(Affidavit Mooney Paragraph 8b, Affidavit, Marmelo Paragraph 52)

45.    In follow-up to this Malcolm matter, on or about June 3, 2002, Mr. Marmelo, a

Comcast employee, went to the home of Mr. Malcolm where Malcolm

surrendered a REBELION black box that had been in his home to the Comcast

employee. After examining the box in question, it was determined that it was a

functioning/working black box.  (Affidavit Mooney Paragraph 8b, Affidavit,

Marmelo Paragraph 53)

46.    When the Taunton Police Department executed the search warrant on the
Defendants home at 333 Cohannet Street, Taunton Massachusetts they also seized
112 U.S. Postal Service Delivery Confirmation documents, and receipts with
dates from April 21st to June 16th, 2001. (Transcript of criminal trial Page 10
lines 19 - 22)

47.    Of significance was the fact that one of these Postal Service delivery confirmation
documents seized was for Plaintiffs' Connecticut employee who purchased a
black box over the Internet. (Transcript of criminal trial Page 10 lines 23 - 24,
Affidavit Jacobs Paragraph 7)

48.    In the course of the criminal investigation, Dimas Amaro made statements to the
police officers to the effect that

    a.    He had not been in business very long (Transcript of criminal trial Page 11
line 12)

    b.    He was not making very much money on these black boxes (Transcript of
criminal trial Page 11 line 11)

49.    In the course of the criminal investigation, Joseph Amaro made statements to the
police officers to the effect that

    a.    Several individuals in the community had purchased several black boxes
(Transcript of criminal trial Page 12 lines 4 - 7)

    b.     He told his brother Dimas Amaro that because they weren't making much money on boxes to get out of the business. (Transcript of criminal trial Page 12 lines 9 - 12)

    c.     They weren't making much money on boxes as they had to pay shipping, and frequently received defective boxes. (Transcript of criminal trial Page 12 lines 14 - 15)

50.    Also of significance is that after the boxes were seized at UPS, but before the police raided their home the Defendants switched the address of where to send the boxes. They started to use their grandparents' address, as opposed to their own address. (Transcript of criminal trial Page 11 lines 16 - 19)

51.    When the Taunton Police Department executed the search warrant on the Defendants home at 333 Cohannet Street, Taunton Massachusetts they searched the area of the home normally utilized by the Defendant Joseph Amaro from where they also seized:

    a.     $7,800 in U.S. currency  (Transcript of criminal trial Page 11 lines 22 - 23)

    b.     An address book, which contains numbers of Wholesale Electronics and Clearview Electronics, as well as particular notes in regard to the black boxes. (Transcript of criminal trial Pages 11 - 12)

52.    When the Taunton Police Department executed the search warrant on the Defendants home at 333 Cohannet Street, Taunton Massachusetts they also seized numerous cable boxes. After examination of the 7 that were in possession of the police after the execution of the search warrant, it was determined that 3 of the 7 boxes were black boxes and that other 4 devices would not descramble. (Affidavit, Marmelo Paragraph 51)

53.    When the Taunton Police Department executed the search warrant on the Defendants home at 333 Cohannet Street, Taunton Massachusetts they also seized:

a.    An invoice from Wholesale Electronics for 10 devices each described as a "VISION 20/20". The price for each device was $85.00. This price is consistent with the purchase of black boxes in such a large number. The VISION 20/20 is a trademark associated with black boxes. Additionally, Wholesale Electronics was a company selling black boxes (see multiple references to this company above). Accordingly, this invoice represents the delivery of 10 black boxes into the Defendants' possession. (Affidavit, Marmelo Paragraph 57a)

b.    An invoice from a company known as the INB GROUP, INC. for 50 devices each described as a "BOSS 5". The price for each device was $96.00. This price is consistent with the purchase of black boxes in such a large number. The "Boss 5" is a well known trademark associated with black boxes. Accordingly, this invoice represents the delivery of 50 black

boxes into the Defendants' possession.  (Affidavit, Marmelo Paragraph 57b)

54.   On January 24, 2005 a certain cable-television box was surrendered by a relative of the Defendants into possession of Mr. Paul Marmelo, a Comcast employee, out of the home of the Defendants. After examining the box in question, it was determined that it was a home made black box.  That is, the device which came out of the defendant's home in 2005 appears to have originally been an addressable converter/descrambler that was modified through the use of a so called "chip". Accordingly, the Defendants had a homemade black box in their home long after this case was initiated. (Affidavit, Marmelo Paragraph 55)

55.   It is clear that the Defendants were operating their business for profit.  This is clear because, shipment of black boxes destined for the Defendants included an invoice from the wholesaler.  That invoice evidenced the fact that the Defendants were paying $70.00 for each black box of the "VM 4000" model.  The Defendants' records show that they were charging as much as $155.00 for that same model. That amounts to an $85.00 markup per black box; that's over 100% markup. (Affidavit Marmelo Paragraph 65, Pay Pal Records - CD)

56.   When Comcast was only using analog scrambling, an individual using a black box could receive, without authorization, all premium channels and all of the pay-per-view channels.  Therefore, to calculate damages where someone was using a

black box with analog scrambling, there are two major elements of the damages: damages for the premium channels and damages for the pay-per-view channels. (Affidavit Marmelo, Paragraph 71)

57.    The prices Comcast was generally charging for premium and pay-per-view signals are set forth above with reference to the pertinent time frame.  With those numbers in mind, it is fairly easy to determine the damage a black box could do. on a monthly basis with reference to premium channels.  If the black box was getting all premium channels that damage would be approximately $65.00 per month. (Affidavit Marmelo, Paragraph 72)

58.    The calculation of damages for the pay-per-view channels is a little bit more difficult. With analog scrambling, a black box could get every pay-per-view offering, including expensive adult offerings and special events, whenever these offerings are shown during the month.  If the damage calculation included the cost of every pay-per-view event during the month that number would be extremely high.  (Affidavit Marmelo, Paragraph 73)

59.    Rather than calculate a pay-per-view monthly damage amount based upon every pay-per-view offered, it can reasonably be inferred that an individual with black box would at least view 10 regular pay-per-views and 4 of the more expensive pay-per-views.  Using the reasonable inference numbers with prices already set forth above, the monthly damage for pay-per-views would be $71.50.  Adding the

$71.50 (the pay-per-view damage number) to the $65.00 (the premium channel damage number) we get a monthly damage number of $136.50 using the reasonable inference method. (Affidavit Marmelo, Paragraph 74)

60.     As set forth above, Comcast did an analysis of their, legal, legitimate high-end pay-per-view purchasers which showed that a significant number of these high-end purchasers purchased 14 pay-per-views per month.  Using the high-end purchaser numbers with prices already set forth above, the monthly damage for pay-per-views would be $55.30. Adding the $55.30 (the pay-per-view damage number) to the $65.00 (the premium channel damage number) we get a monthly damage number of approximately $120.00 using the high end purchaser method. (Affidavit Marmelo, Paragraph 75)

61.     Averaging the two per month damage calculations we achieve an approximate monthly damage amount for using a black box with analog scrambling of $128.00. (Affidavit Marmelo, Paragraph 76)

62.     All of the Subject black boxes were sold by the end of June, 2001.  At that point in time all of Comcast's premium and pay-per-view offerings were analog channels utilizing analog scrambling.  After about a year, Comcast started to move its premium and pay-per-view offerings, incrementally, from analog channels to digital channels utilizing digital scrambling.  This was done in such a

way that by June, 2005 all of the premium stations and pay-per-view events were on digital channels. (Affidavit Marmelo, Paragraph 77)

63.    As premium stations and pay-per-view stations were moved from analog channels to digital channels, the black boxes would have the ability to do less and less damage. Based upon this information, the calculated estimated damages for the approximate four year life span of these black boxes as follows:

    a.    6/15/01 to 6/15/02. During the first year the black boxes could get all premium stations and pay-per-view offerings; the yearly damage would be approximately $128 x 12 = $1,536.00.

    b.    6/15/02 to 6/15/03. During the second year relatively few offerings were moved to digital in the black boxes could still get a considerable amount of channels; yearly damage would be approximately $80 x 12 = $960.00.

    c.    6/15/03 to 6/15/04. During the third year more and more pay-per-views were removed from analog signals and the black boxes would have less and less use; the yearly damage would be approximately $65 x 12 = $780.00.

    d.    6/15/04 to 5/12/05. During the final year there would be hardly any pay-per-views on analog channels and the black boxes could, most likely only receive a few premium channels; yearly damage would be approximately $10 x 11 = $110.00.

Totaling all these numbers, it is an approximate estimation that each black box sold into one of Comcast's New England systems would cause $3,386.00 in damage from the end of June, 2001 until these boxes could no longer work in the system. (Affidavit Marmelo, Paragraph 78)

64.    Comcast's personnel has examined cable boxes associated with the Defendants and have found them to be black boxes.  Specifically, Comcast examined the following models and found them to be black boxes:

    a.            Clear Max 3000

    b.            VM 4000

    c.            VM4000 UNIVERSAL

    d.            COOL BOX

    e.            VM+PLATINUM UNIVERSAL

    f.            Global 2600

    g.            View Master 4040

    h.            Millennium 3

    i.            REBELION

These models will hereinafter be referred to as "models associated with the Defendants that Comcast has actually examined". (Affidavit Marmelo, Paragraph 58)

65.    A detailed review of the computer records of the Defendants and the Pay Pal records of the Defendants evidences the fact that the records take note of that type

of device, by model, being sold and/or distributed. Specifically, the records reveal that:

    a.    Between June 1, 2000 and the middle of June, 2001 when the police raided their home, the Defendants sold and/or distributed approximately 932 black boxes of the models associated with the Defendants that Comcast has actually examined. (Affidavit Marmelo, Paragraph 59a)

    b.    Between June 1, 2000 and the middle of June, 2001 when the police raided their home, the Defendants sold and/or distributed approximately 91 black boxes of the models associated with the Defendants that Comcast has actually examined into the franchise areas of the Plaintiffs. (Affidavit Marmelo, Paragraph 59b)

66.    A detailed review of the computer records of the Defendants and the Pay Pal records of the Defendants evidences the fact that the records take note of that type of device, by model, being sold and/or distributed. Also, October 28th 2000 is a date that may have some legal significance. Specifically, the records reveal that:

    a.    Between October 28, 2000 and the middle of June, 2001 when the police raided their home, the Defendants sold and/or distributed approximately 674 black boxes of the models associated with the Defendants that Comcast has actually examined. (Affidavit Marmelo, Paragraph 60a)

    b.    Between October 28, 2000 and the middle of June, 2001 when the police raided their home, the Defendants sold and/or distributed approximately 86 black boxes of the models associated with the Defendants that

Comcast has actually examined into the franchise areas of the Plaintiffs.
(Affidavit Marmelo, Paragraph 60b)

67.    A detailed review of the computer records of the Defendants and the Pay Pal records of the Defendants evidences the fact that the records take note of that type of device, by model, being sold and/or distributed.  Specifically, the records reveal that:

    a.    Between June 1, 2000 and the middle of June, 2001 when the police raided their home, the Defendants sold and/or distributed proximately 1,700 black boxes; (Affidavit Marmelo, Paragraph 61a)

    b.    Of the black/boxes sold in distributed between June 1, 2000 and the middle of June, 2001, approximately 110 were sold directly into the franchise areas of the Plaintiffs; (Affidavit Marmelo, Paragraph 61b)

    c.    The Defendants received approximately $130,000.00 from third parties from the sales and/or distribution of the black boxes. (Affidavit Marmelo, Paragraph 62b)

    d.    Between June 1, 2000 and the middle of June, 2001 when the police raided their home, the Defendants sold and/or distributed approximately 15 "chips", none of these appeared to be distributed into the franchise areas of the Plaintiffs. (Affidavit Marmelo, Paragraph 64)

2/2/2006                          /s/ John M. McLaughlin
Date                              John M. McLaughlin (BBO 556328)
                                  **Green, Miles, Lipton & Fitz-Gibbon LLP**
                                  77 Pleasant Street
                                  P.O. Box 210
                                  Northampton, MA 01061-0210
                                  Telephone: (413) 586-0865
                                  Facsimile: (413) 584-6278